IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BENJAMIN DAVIS,                          *
        Plaintiff,

v.                                       *     CIVIL ACTION NO. WDQ-08-2366

SARAH CONAWAY, et al.,                   *
        Defendants.

                ***

## MEMORANDUM

Pending are the defendants Corizon, Inc., Lynn Jones, Jen Blair, Richard Miller, and Mark

Gonzalez's motions to dismiss or for summary judgment (ECF Nos. 51, 67), and Benjamin Davis's

motion for leave to file an amended complaint (ECF No. 42). Upon review of the papers and

exhibits filed, the Court finds a hearing unnecessary. See Local Rule 105.6 (D. Md. 2011). For the

reasons stated, the defendants' Motions will be construed as Motions for Summary Judgment and

granted.[1]

## Background

Davis was an inmate at Roxbury Correctional Institution ("RCI") in 2008, when he

experienced kidney, urinary tract, and ear problems. ECF No. 42 at 2.[2]

Corizon, then known as Correctional Medical Services ("CMS"), an independent contractor,

provided medical services for the RCI inmates. Id. at 2-3. In 2008, Jones was CMS's Regional

---

[1] Counsel was appointed for the limited purpose of assisting the plaintiff in effecting service. ECF No. 28. Despite assistance of counsel, defendant Sarah Conaway remains unserved. ECF No. 70. For the reasons that follow, even if Conaway had been properly served with the complaint, she would be entitled to judgment. Accordingly, the complaint against her will be dismissed and Shaivitz will be released from his representation of Davis.

[2] On November 9, 2011, Davis moved for leave to file an amended complaint and filed an addendum to his original complaint. ECF No. 42. Davis's motion will be granted, and the Court will consider the allegations and claims in the original and amended complaint in this opinion.

Operations Manager "in the Western and Hagerstown regions," which encompassed RCI. ECF No. 51-2 ¶1.[3] At the time, CMS employed at least one full-time physician's assistant ("PA"), several part-time PA's, and at least two physicians to staff three correctional facilities in the Hagerstown region. *Id.* ¶9. Davis believes that Sarah Conaway supervised the nurses at RCI, and Blair was a PA responsible for filing and distributing sick call slips to ensure that inmates were treated at RCI. ECF No. 9. Davis alleges that he was deliberately denied medical attention for several months due to Jones and Conaway's failure to adequately staff the medical department. ECF No. 1 at 4-5. He claims that inmates in the segregation unit were to be seen by a PA and nurse practitioner seven days a week, and the RCI handbook required that a PA be available or on call 24 hours a day. *Id.* Davis alleges this was not the case at RCI because Jones and Conaway failed to hire a full-time PA. He states that RCI shared a PA with three other prisons in the region, and as a result, inmates on segregation waited months without treatment. *Id.* at 5. For several months, he filed numerous medical requests, but he claims he received no treatment. He experienced a burning sensation when he urinated, had blood in his urine, constantly vomited, and severe pain and drainage in both ears. *Id.*

Davis's medical records show that between April 2, 2008 and August 6, 2008, he submitted nine sick call slips.[4] ECF No. 51-3 at 2-10. Between April 2 and 7, 2008, Davis submitted three sick call slips complaining of back pain from a March 7, 2008 fall from the medical cart. *Id.* at 2-4. Blair

---

[3] Jones is "not a health care provider and did not administer health care to the inmates." ECF No. 51-2 ¶1. He "was not responsible for hiring physicians and physicians['] assistants. This was done by the Statewide Medical Director and the on-site Medical Directors." *Id.* ¶9. He "assist[ed] in recruiting and with increasing staffing levels to be in compliance with CMS's contract with the state of Maryland." *Id.*

[4] He marked each "emergency." ECF No. 53-3 at 2-10.

evaluated him on April 8, 2008; Davis said he "got jammed in the door in the Rec hall for 5 minutes." *Id.* at 5. Blair gave Davis non-prescription painkiller, and returned an hour later. Davis was then lying "quietly" on a stretcher, and though he did not appear to be in "acute distress," he said he had "excruciating pain in [his] back." Blair arranged for a doctor to evaluate Davis; Dr. Aldana evaluated Davis at 10:00 a.m. on April 8, 2008, ordered an x-ray, and provided cream to treat a rash for which Davis had submitted a sick call slip that day. *Id.* at 8. As Davis jumped over his bedrails and walked out of the dispensary, he said he could not walk and wanted an order for bed rest. ECF No. 51-3 at 8. Davis was x-rayed on April 10, 2008; no abnormalities were revealed. *Id.* at 10.

On April 8, 2008, Davis submitted another sick call slip, complaining of a chest cold and fluid in his lungs. *Id.* at 9. Davis was seen on April 21, 2008; the nurse observed a cough, but not expectoration. Davis was directed to follow up as needed. *Id.* at 9.

On April 19, 2008, Davis submitted another sick call slip about his back pain from the March 7, 2008 fall. ECF No. 51-3 at 11. Pamela Needham, RN examined him on April 26, 2008. She saw no swelling, redness, or hesitation in his gait, and he appeared in no obvious distress. Davis asked for pain medication; Needham put him on bed rest and "no play" status. *Id.* at 12-13.

On May 15, 2008, Crystal Swecker, PA, tried to examine Davis in response to a sick call slip dated May 3 and two from May 11, 2008, complaining of a rash on his feet from dye in his shower shoes, continued back pain, and sinus pain from allergies. *Id.* at 14-20. Davis refused to allow PA Swecker to perform a visual screening, and would not tell the nurse his weight when he stood on the scale. *Id.* at 15. PA Swecker noted four "unresolved diagnoses": dermatitis and eczema, shortness of breath, rhinitis and allergies, and a sprain or strain in his back. *Id.* RN Baumgardner also responded to Davis's May 3 and 11 call slips, as well a May 30, 2008 slip complaining about his

3

allergies. She examined Davis on June 5 and 20, 2008, instructing him on how to clean his shower shoes, and promising to request medicine for the allergy and sinus problems. *Id.* at 17-20.

Davis was examined three times in walk-up consultations. On July 17, 2008, he complained about his back spasms. *Id.* at 21. Alexandra McCoy, LPN, noted that Davis's back was swollen on the left side. She gave him Toradol, Motrin, and an analgesic balm, prescribed him Naprosyn, and told that he should consider sport and weight lifting restrictions for five days. McCoy saw Davis "laughing and carrying on" and did not think he was in distress. *Id.* at 22-24.

Two days later, Davis was again evaluated as a walk-up patient in the dispensary. He complained of earache and prostate problems and stated he had burning upon urination. *Id.* at 25. Gina Lawrence, RN, performed a urine dip check of Davis's urine, and observed normal values. Davis's right ear was impacted with wax and dry blood. He was given ear wax drops for five days and instructed to return to the clinic for an ear flush. *Id.* The ear flush could not be performed as scheduled on July 23, 2008, as the prison was on lock down, but the next day his ears were flushed and a small amount of wax was removed. Both of his ear canals were red. Davis was advised against putting foreign objects in his ears.[5] *Id.* at 26.

Davis has filed a declaration swearing that he received no medical treatment between July 8 and August 5, 2008, despite filing multiple sick call slips. ECF No. 53 at 14. A sick call log reflects the June 5 and 20 visits, and an August 8 examination, but no visits in July, 2008. ECF No. 53 at 15.

---

[5] Davis believes that the dates on the sick call slips were manipulated. ECF No. 53 at 6.

4

Davis claims that on August 5, 2008, he protested the lack of medical attention by refusing to return to his cell from the recreation yard until he received treatment. ECF No. 1 at 5.[6] That day, Miller, RCI's Chief of Security, e-mailed RCI Warden Nancy Rouse, stating:

> Just found out today that medical has not been to [the segregation unit] for Seg Sick Call since June 20, 2008. This is ridiculous. Especially since as I write this Inmate Benjamin Davis is refusing to return to his cell from the outside exercise cages until he is seen by medical for an illness that he sent on a sick call slip back on July 8, 2008, which medical admitted to receiving.

ECF No. 53 at 17. Miller confirmed, in a deposition, that "as of August 5th, [2008,] no one from medical had made it [to the segregation unit] since June 20th of 2008." *Id.* at 20. He also stated that RCI contracted with CMS to provide medical services to inmates, and CMS had "a contractual obligation to go to the seg[regation] unit on a daily basis and review the inmate population . . . to see if anybody has any medical complaints and this wasn't being done. . . . They basically said we don't have enough people to do it." *Id.* at 21. Miller did not know that CMS was not visiting the segregation unit daily before August 5, 2008. *Id.*

Miller has sworn that he "had no authority over the health care contractor to require its employees to perform pursuant to its contract or to provide medical care in any particular manner." *Id.* According to former Chief of Security John M. Stouffer, that position's duties included "ensuring that State contractors that provide medical services to the institution provide medical care to the inmates." ECF No. 69 at 20 (Stouffer dep.).

On August 6 or 8, 2008, a physician's assistant and nurse practitioner were sent to RCI's segregation unit to evaluate and treat the inmates housed there. ECF No. 1 at 5. Davis contends that

---

[6] Because of his protest, Davis was sentenced to 120 days segregation. ECF No. 1 at 6. The time was reduced on appeal to 60 days because of his extenuating medical circumstances. ECF No. 1 at 13.

this evaluation revealed that his untreated urinary infection had spread to his kidney, prostate and bladder, and his ear infection had resulted in partial deafness in his right ear. *Id.* at 5-6. He was prescribed antibiotics. *Id.* at 6.

Davis may have also been evaluated as a walk-up patient on August 6, 2008. He complained of ear infection, difficulty urinating, and impotence. ECF No. 51-3 at 27. According to the walk-up slip, his right ear was slightly impacted, his urine tested negative for infection, and he was referred to the medical surgical clinic for evaluation. *Id.* On August 8, 2008, he was prescribed antibiotics which he did not receive until August 15, 2008. ECF No. 53 at 16. On August 20, 2008, Dr. Erwin Aldana evaluated Davis and ordered unexplained lab tests. Davis was prescribed antibiotic drops for an ear infection and directed to follow up with the PA in 90 days or as needed. ECF No. 51-3 at 29.

On September 8, 2008, Davis tried to overdose by ingesting Naprosyn, Actifed, and laundry detergent. *Id.* at 30. He was transported to the Emergency Department of Washington County Hospital, where he told Dionne Smith, M.D., that he had tried to overdose because no one was paying attention to his ear infection and urinary and abdominal pain. *Id.* at 33. Dr. Smith examined Davis's ear and observed no sign of infection or wax in the canal. His urinalysis was negative. *Id.* at 34. A CT scan of the plaintiff's abdomen and pelvis were ordered to evaluate Davis's complaint of abdominal pain and blood in his urine, but he refused to undergo the CT scan. *Id.*, p. 33-35.

Davis claims that Miller and Housing Unit Manager Gonzalez knew of the ongoing failure to provide medical care to segregation inmates but failed to take corrective action. ECF No. 42 at 5. He also claims that Gonzalez deliberately withheld, for over a year, an administrative complaint that Davis filed on September 9, 2008, to deny him access to courts. *Id.* Gonzalez has sworn that he did not interfere with Davis's medical care, and had no duty or authority over CMS's provision of

6

medical services to the inmates. ECF No. 67-3 ¶¶2-3. Nina Rizer, an RCI corrections officer, stated that she recalled that the Housing Unit Lieutenant was responsible for making sure that sick inmates were seen by medical personnel. ECF No. 69 at 16, 23.

On September 9, 2008, Davis sued Conaway and Jones, alleging that they had failed to adequately staff RCI, violating CMS's contract. Davis claimed that the lack of medical attention violated his Eighth Amendment right to be free from cruel and unusual punishment. ECF No. 1. In October, 2008, Davis sought and received permission to add Blair as a defendant. ECF Nos. 9, 10. On September 24, 2009, after Davis and the United States Marshals Service were unable to serve Conaway, Jones, or Blair, Davis amended his complaint to add CMS as a defendant. ECF No. 25.

On October 14, 2010, the Court appointed Daniel Shaivitz, Esq., to represent Davis for the limited purpose of helping him obtain service on the defendants. ECF No. 28. CMS, Jones, and Blair ("the CMS defendants") were served or waived service in late 2011 and early 2012. ECF Nos. 44, 49, 58. Conaway has not been served.

On November 9, 2011, Davis moved amend his complaint by again adding CMS, and Miller and Gonzalez. ECF No. 42. All waived service. ECF Nos. 54, 55. On December 30, 2011, CMS and Jones moved to dismiss or for summary judgment. ECF No. 51. On February 27, 2012, after she had been served, Blair moved to join CMS and Jones's motion. ECF No. 63. The Court granted Blair's motion. ECF No. 65. On April 13, 2012, Miller and Gonzalez moved to dismiss or for summary judgment. ECF No. 67. Davis has opposed both motions to dismiss. ECF Nos. 53, 66, 69.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

7

fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (*quoting* Fed. R. Civ. P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted).

## Discussion

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone,* 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter,* 501 U.S.294, 297 (1991)).

To establish an Eighth Amendment claim, the plaintiff must present evidence that prison officials acted with a culpable state of mind to deprive the plaintiff of a basic human need that is

8

objectively sufficiently serious. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (Eighth Amendment prohibits "unnecessary and wanton infliction of pain."); *see also Helling v. McKinney*, 509 U.S. 25, 32 (1993) (deliberate indifference to future harm caused by ETS).

To support an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the defendants' actions or inactions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The plaintiff must show that (1) he was suffering from an objectively serious medical need, and (2) the prison staff were subjectively aware of the need for medical attention but recklessly failed to provide the needed care or ensure it was available. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).[7] "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).[8] If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. The Court assesses the reasonableness of the actions in light of the risk the defendant actually knew about at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000).

In order to demonstrate liability under § 1983 on the part of supervisory defendants, the plaintiff must show that: "(1) the supervisory defendants failed promptly to provide an inmate

---

[7] Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40.

[8] "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (*quoting Farmer* 511 U.S. at 844).

9

with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990).

It took several weeks for Davis to obtain antibiotics to treat both his ear and urinary complaints, but he has not shown that the defendants had the requisite subjective knowledge of his conditions. There is no evidence that the delays that have occurred were deliberate. To the extent some of Davis's complaints went unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105.  At most, Davis has demonstrated that the officers and medical personnel were negligent in performing their duties. "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked Davis's symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (doctor's actions inconsistent with an effort to hide a serious medical condition suggested the doctor lacked subjective knowledge of condition). Similarly, without evidence that Miller and Gonzalez knew about CMS's failure to treat Davis, Davis cannot show that the officers are liable. *See Rich*, 129 F.3d at 340 n.2

Further, the evidence is that Davis's requests were considered and his needs addressed within about a month of each request he made. *See* ECF No. 53 at 15. Davis's grievances with the medical decisions made in light of his symptoms may frustrate him, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983

claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985). There are no exceptional circumstances in this case. Accordingly, the medical defendants are entitled to judgment.

The evidence is that when Miller learned about Davis's protest for medical attention, Miller ensured that Davis was promptly seen. ECF No. 53 at 17. Davis has pointed to no action on the part of Miller or Gonzalez interfering with his medical care, and identified no evidence supporting his claim that Gonzalez prevented him from filing an administrative complaint.

Likewise, Davis's claims against CMS are based solely upon the doctrine of *respondeat superior.* The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir. 1982); *Burton v. Youth Servs. Int'l, Inc.,* 176 F.R.D. 517, 520 (D. Md. 2007). The plaintiff's claims against CMS will be dismissed.

### Conclusion

For the aforementioned reasons, the defendants' Motions, construed as motions for summary judgment, will be granted. A separate Order follows.

Date: 8/20/12

William D. Quarles, Jr.
United States District Judge

11